IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

AMERICAN PILEDRIVING EQUIPMENT, )
INC., )
)
Plaintiff, )
)    Civil Action No. 2:08-CV-00895-DSC-LPL
v. )    Judge David S. Cercone
)    Magistrate Judge Lisa Pupo Lenihan
EQUIPMENT CORPORATION OF )
AMERICA, )
)
Defendant. )

## REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that the following constructions be adopted for the five

terms and phrases at issue in these proceedings:

1.      "Cylindrical gear portion" has been agreed by the parties to mean "**the 'gear portion' of

the counterweight is a substantially cylindrical portion and has a rear face, a front

face, and a plurality of gear teeth around its perimeter;**"

2.       "Connected to**" is construed to mean "**joined together, united or linked;**"

3.      "Integral"is construed to mean **"forming a complete structural whole;"**

4.      "Eccentric weight portion" is construed to mean **"the portion of the counterweight,

being made of a first metal, that provides unbalanced weight to the counterweight

with respect to the counterweight's axis of rotation, and with at least one insert-

receiving area;"** and

5.      "Insert-receiving area" is construed to mean  "**a bore, formed in the eccentric weight

-1-

**portion of the counterweight, which is designed to receive and securely hold one solid insert member made of a second metal having a specific gravity higher than that of the first metal and a melting point temperature of 328° C or greater.**"

## II. REPORT

On June 23, 2009, Plaintiff American Piledriving Equipment, Inc. (hereinafter "APE") and Defendant Equipment Corporation of America (hereinafter "ECA") appeared before this court pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), in order to present their arguments regarding the construction of five disputed terms and/or phrases in the claims of U.S. Patent No. 5,355,964 (hereafter "'964 Patent"). These terms are : (1) the "cylindrical gear portion"; (2) "connected to"; (3) "integral"; (4) "eccentric weight portion"; and (5) "insert-receiving area".

The '964 Patent recites a "pile driving and/or pile pulling assembly for imparting a vibratory force on a pile." See APE's Compl. (Doc. No. 1), ¶ 9. APE alleges that ECA has infringed claims 1-3, 5-14 and 16-18 of the '964 Patent, pursuant to 35 U.S.C. § 271(a), by "using, offering to sell or rent, selling and/or renting certain vibratory pile driving devices in the United States." See APE's Opening Claim Construction Br. (Doc. No. 30), at 4. Several suits alleging infringement of the '964 Patent have been filed by APE against multiple defendants in various Federal judicial districts throughout the United States. One of those suits, filed in United States District Court for the Northern District of California, has led to an order construing the five terms at issue in this case. See, generally, American Piledriving Equipment, Inc. v. Bay Machinery Corp., No. C 08-1934 PJH, 2009 WL 1684611 (N.D.Cal. June 12, 2009).

-2-

A.  <u>Background</u>

The following background information comes from the '964 Patent. Pile driving

equipment is used to drive piles into the earth to form stable supports for buildings and other

structures.  <u>See</u> '964 Patent, col. 1, ll. 12-15. Similarly, pile extracting equipment is used to

remove large piles from the earth.  <u>See</u> '964 Patent, col.1,  ll. 15-17.  Unlike pile driving

equipment that uses a hammer-like weight to drive a pile, vibratory pile drivers utilize rotating,

unevenly balanced counterweights to create a vibratory force, which is then imparted onto a pile.

The pushing and/or pulling forces exerted on a pile by such a vibratory apparatus can be quite

strong; however, the high frequencies at which the counterweights must rotate create large stress

loads within the counterweights, as well as high temperatures within the device due to friction.

<u>See</u> '964 Patent, col. 1, ll. 34-38.

The '964 Patent admits prior art that includes a vibratory assembly with counterweights

that have eccentric weights bolted to a cylindrical gear.  <u>See</u> '964 Patent, col. 1, ll. 39-41.

However, this particular design in the prior art suffers from a lack of durability, as the bolts tend

to break due to the high stress loads generated on the counterweights during rotation.  <u>See</u> '964

Patent, col. 1, ll. 41-45.  Attempts have been made to overcome this problem by using a cast,

one-piece, solid counterweight having an eccentric weight integral with a cylindrical gear

portion.  However,  such counterweights do not have enough mass to generate sufficient force to

drive or pull a pile.  <u>See</u> '964 Patent, col. 1, ll. 45-51.

The '964 Patent identifies that attempts have been made to increase the eccentric weight

of the vibratory apparatus by pouring molten lead into machined or cast bores in the

counterweights, and then allowing the lead to solidify.  This met with limited success, as such

-3-

apparati produced vertical vibratory amplitudes of less than one inch.  See '964 Patent, col. 1, ll. 51-59.  Furthermore, problems were experienced in balancing these counterweights due to difficulties adding exact amounts of molten lead.  Additionally the lead inserts, having a relatively low melting-point, would partially liquify and shift position during operation of the vibratory apparati, due to the heat produced by the friction of their moving parts.  See '964 Patent, col. 1, ll. 55-68, col. 2, ll. 1-2.  Attempts to overcome this issue by lubricating the moving components of these apparati did not fully alleviate the problem, and led to lead contamination of the lubrication, which created an environmental hazard.  See '964 Patent, col.2, ll. 3-7.

The '964 Patent was issued to John White on October 18, 1994.  The 27 claims of the patent recite the structure of a pile driving and/or pile pulling vibratory assembly, along with a method for making the invention.  The housing of the assembly has at least one counterweight receiving area adapted to rotatably carry at least one counterweight.[1]  The counterweight is made of a first metal, such as steel, and has a cylindrical gear portion and an eccentric weight portion.

Formed within the eccentric weight portion of the counterweight is at least one insert-receiving area, which is designed to contain securely a solid insert made of a second metal, which has a higher density than the first metal used to form the cylindrical gear portion and the eccentric weight portion.  The '964 Patent indicates that this insert should be made of tungsten (hereinafter "tungsten rod" or "tungsten insert"), because that metal possesses a high density.  Tungsten also has a melting point of well above 328° C, ensuring that the tungsten insert will not become fluid during operation of the vibratory assembly.  At least one driving motor is

---

[1]The preferred embodiment of the invention recited in the '964 Patent utilizes two synchronized, rotating counterweights in order to maximize vertical vibratory motion and minimize horizontal vibratory motion.

operatively connected to the counterweight, and is adapted to rotate the counterweight rapidly in order to generate substantial vibratory forces.

    B.  <u>Legal Standard</u>

It is a well established principle of patent law that "'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citing <u>Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.</u>, 381 F.3d 1111, 1115 (Fed. Cir. 2005)).  The construction of the claims, and thus the upper limit of the scope of a patent's protection, is a question of law which is "exclusively within the province of the court."  <u>Markman</u>, 517 U.S. at 372.  Given the importance of this task, there exists a wealth of case law explaining the proper methodology to be used by a court engaging in claim construction.

    1.  <u>Rules of Claim Construction</u>

Evidence used in claim construction is generally divided between intrinsic evidence and extrinsic evidence.  Intrinsic evidence, which includes the language of the claims themselves, the specification, and any of the prosecution history of the patent that is in evidence, is favored by the courts.  <u>See</u> <u>e.g.</u>, <u>Teleflex, Inc, v. Ficosa North Am. Corp.</u>, 299 F.3d 1313, 1324-25 (Fed. Cir. 2002) (internal citation omitted).  Intrinsic evidence is useful because it "may provide context and clarification of the meaning of claim terms."  <u>Id.</u> at 1324 (internal citation omitted).  It is widely recognized as "'the most significant source of the legally operative meaning of disputed claim language.'" <u>Id.</u> at 1325 (quoting <u>Vitronics Corp. v. Conceptronics, Inc.</u>, 90 F.3d 1576,

1582 (Fed. Cir 1996)).

      The proper place to begin with any claim construction analysis is the language of the claims themselves. <u>See</u> <u>e.g.</u>, <u>Phillips</u>, 415 F.3d at 1312-13.  The terms used in the claims are typically given their "ordinary and customary meaning." <u>Id.</u> at 1312-13 (quoting <u>Vitronics</u>, 90 F.3d at 1582).  It is important to note that "ordinary and customary meaning" is determined not from the point of view of a layperson, but is defined as "the meaning that the terms would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the filing date of the patent application." <u>Phillips</u>, 415 F.3d at 1313.  The United States Court of Appeals for the Federal Circuit has recognized that the ordinary and customary meaning of a disputed term may be apparent "even to a lay judge, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." <u>Id.</u> at 1314.  In cases where the meaning is not readily apparent, the context in which a disputed term is used in the asserted and unasserted claims may be "highly instructive" in how the person having ordinary skill in the art would interpret those claims.  <u>See</u> <u>id.</u>  Additionally, there is a presumption in claim construction that terms used in the claims of a patent have the same meaning throughout the patent.  <u>Id.</u>  As such, the manner in which a term is used in multiple claims can grant insight into its meaning to a person having skill in the applicable art.  <u>Id.</u>

      The "ordinary and customary meaning" provides a useful baseline from which a court may form a proper construction of a disputed term or phrase in a claim. However, it is possible, and indeed quite acceptable, for an inventor to deviate from the ordinary and customary meaning

of terms or phrases used in claim language.[2]  Such a deviation may come in the form of an

explicit disclaimer or definition of a term, see York Products, Inc. v. Central Tractor Farm &

Family Center, 99 F.3d 1568, 1572 (Fed. Cir. 1996), or it may be implicit from how the terms

and or phrase is used in the patent document as a whole.[3]  Phillips, 415 F.3d at 1316.  Indeed, as

is seen below, the disputed terms of the claims cannot be read in a vacuum, and must comport

with the words of the specification.

The specification is a statutorily required section of a patent that contains a:

> written description of the invention, and of the manner and process
> of making and using it, in such full, clear, concise, and exact terms
> as to enable any person skilled in the art to which it pertains, or

---

[2]It is an axiom of patent law that an inventor may be his or her own lexicographer, meaning that an inventor is free to define the terms of the patent in any manner that he or she sees fit - even those terms that already possess a well-established meaning in the art.  One commonly used example of this is that a "foot" in a particular patent may be defined as being thirteen inches.  Meaning that deviate from the "ordinary and customary meaning" of terms within the patent may be explicitly stated, or implicitly defined through their consistent use in the language of the patent.  See e.g., Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc., 262 F.3d 1258, 1268-71 (Fed. Cir. 2001).

[3]APE argues that a term of a claim cannot deviate from its ordinary and customary meaning absent an express intent by the inventor.  See Doc. No. 30 at 6.  Express intent may be satisfied by an explicitly stated definition deviating from the ordinary and customary meaning of a term.  However, the Federal Circuit has also allowed that methods other than an explicit statement may clearly show that the definition of a term has been changed from its ordinary and customary meaning.  See e.g., Bell Atl. Network Servs., 262 F.3d at 1268.  As was stated in Phillips, "[u]ltimately, the interpretation to be given to a term can only be determined and confirmed with a full understanding of what the inventors actually intended to envelop in the claim."  415 F.3d at 1316 (quoting Renshaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).  As such, the measure to determine any deviation of a term or phrase from the "ordinary and customary meaning" is that the language of the intrinsic evidence as a whole persuasively demonstrates such a deviation.  In the end, "the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  Phillips, 415 F.3d 1316 (quoting Renshaw, 158 F.3d 1250); see also Phillips, 415 F.3d at 1320-21.

> with which it is most nearly connected, to make and use the same,
> and shall set forth the best mode contemplated by the inventor of
> carrying out his invention.

35 U.S.C. § 112.  In the context of construing disputed claims or phrases from the claims, it is well established that the claims of a patent "must be read in view of the specification, of which they are a part."  Phillips, 415 F.3d at 1315 (quoting Markman, 52 F.3d at 979).  Indeed, the Federal Circuit has taken special efforts to underscore the importance of the specification to the construction of claims, noting that "[it] 'is always highly relevant to the claim construction analysis.  Usually it is dispositive; it is the single best guide to the meaning of the disputed claim.'"  Phillips, 415 F.3d at 1315 (quoting Vitronics, 90 F.3d at 1582).  As such, the specification "acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication."  Phillips, 415 F.3d at 1321 (internal quotations omitted).  Therefore, the language of the specification can limit the scope of the right to exclude offered by the patent, even if such a limitation is not expressed in the claims themselves.

However, while reading the claims in light of the specification, a court must be wary not to unduly read limitations in the specifications onto the claims.  Id. at 1323; see also Sjoland v. Musland, 847 F.2d 1573, 1581-82 (Fed. Cir. 1988).  For example, in cases where the specification is limited to the description of one preferred embodiment of an invention, it has been held that the claims need not be construed as being limited to that embodiment.  Phillips, 412 F.3d at 1323 (citing Gemstar-TV Guide Int'l, Inc. v. ITC, 383 F.3d 1352, 1366 (Fed. Cir. 2004), and noting that a person of ordinary skill in the art "rarely would confine their definitions of terms to the exact representations depicted in the embodiments").

-8-

The Court of Appeals for the Federal Circuit has recognized the difficulty of making the distinction between reading the claims of a patent in light of the specification, and improperly reading in a limitation from the specification.  Phillips, 415 F.3d at 1323; see also Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1367-68 (Fed. Cir. 2007) (comparing the district court's task in making this distinction to walking a tightrope).  Given this difficulty, courts are reminded that "the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on *understanding how a person of ordinary skill in the art would understand the claim terms*."  Phillips, 415 F.3d at 1323 (emphasis added).  As such, the interpretation of the specification that would be made by a person having ordinary skill in the applicable art should be a guide for the court in determining whether limitations not expressly in the claims language should be applied to disputed terms or phrases.

The final piece of intrinsic evidence to be considered by a court when construing disputed claim terms or phrases is the patent's prosecution history, if in evidence.  See Phillips, 415 F.3d at 1317.  The prosecution history consists of the complete record of the proceedings before the United States Patent and Trademark Office (hereafter "PTO"), and includes any prior art cited during the examination of the patent.  Id.  This evidence is useful because, like the specification, "the prosecution history was created by the patentee in attempting to explain and obtain the patent."  Id.  As such, the prosecution history can grant insight into the scope of the invention, as understood by the inventor and the PTO, and whether that scope is narrower than the claim language would otherwise indicate.  Id.

It is important to note, however, that the prosecution history also recounts an ongoing

negotiation between the inventor and the PTO, and not the final product of their negotiation.  As such, it is recognized that the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes."  Id.  Thus, in order for a limitation of the scope of the claims to be read from the prosecution history, the inventor must have made a "clear and unmistakable disavowal" of a broader scope of protection during prosecution.  See Purdue Pharma L.P. v. Endo Pharms. Inc., 438 F.3d 1123, 1136 (Fed. Cir. 2006).  Such a disavowal may occur when an inventor explicitly characterizes an invention in order to overcome prior art.  Id.  However, this characterization must be without ambiguity.

Extrinsic evidence, such as expert testimony, treatises, and dictionaries may also be employed by courts in their claim construction analyses, but its use is disfavored.  See Phillips, 415 F.3d at 1318-19.  Extrinsic evidence is recognized as being useful in providing background information, such as the scientific principles underlying the applicable art.  However, it has been found by the Federal Circuit to be less reliable than intrinsic evidence in construing the terms of a patent.  See id. at 1318.  This is because "extrinsic evidence by definition is not part of the patent and . . . [was] not created at the time of the patent prosecution for the purpose of explaining the patent's scope and meaning."  Id.  Furthermore, learned treatises may not have been written by persons having skill in the art applicable to the patent, and expert witnesses may suffer from bias.  Id.  The claims, specification and prosecution history, on the other hand, were all created with the specific art (and indeed, invention) in mind, and with the specific intention of providing notice to persons having skill in the art of the scope and limitations of the invention and the patentee's right to exclude.  See id. at 1318-19; see also 35 U.S.C. § 112.

2. <u>Reasoned Deference to Prior Constructions by Other Courts</u>

As is noted above, the same five terms and phrases at issue in this Report and

Recommendation were recently construed in the United States District Court for the Northern

District of California, pursuant to litigation between APE, which is the Plaintiff in the current

case, and Bay Machinery Corp., which is not a party to this case.  <u>See</u>, <u>generally</u>, <u>Bay</u>, 2009 WL

1684611.  During oral argument before this Court, ECA argued that "reasoned deference" should

be applied to the Northern District of California's construction of the disputed terms.  <u>See</u> Tr. of

June 23, 2009 Claim Construction Hr'g (Doc. No. 42), at 5-7, 23-26.  This argument is based on

the Supreme Court's decision in <u>Markman</u>, in which Justice Souter, delivering the opinion of the

unanimous Court, underscores the importance of maintaining uniform interpretations of claim

terms in and between judicial districts, noting that "the limits of a patent must be known for the

protection of the patentee, the encouragement of the inventive genius of others and the assurance

that the subject of the patent will be dedicated ultimately to the public."  517 U.S. at 390 (citing

<u>General Elec. Co. v. Wabash Appliance Corp.</u>, 304 U.S. 364, 369 (1938)).

The standard of "reasoned deference" to the prior constructions of terms or phrases is

discussed by the Northern District of California.  <u>See</u> <u>Visto Corp. v. Sproqit Tech., Inc.</u>, 445

F.Supp.2d 1104 (N.D.Cal. 2006).  The court in that case was faced with the task of construing a

claim that had already been construed by a judge  in the Eastern District of Texas.  Citing the

importance of  uniform claim construction, as recognized in <u>Markman</u>, the Northern District of

California determined it was necessary to consider the prior construction of the disputed claim

terms by the Eastern District of Texas.  <u>Visto</u>, 445 F.Supp.2d at 1108.  However, the district

court in <u>Visto</u> recognized that, given the fact that the prior construction of the disputed terms

-11-

came from another jurisdiction, it was within the court's discretion to determine what degree of deference to grant the prior order.  Id. at 1108-1109.  The court in Visto concluded that it was proper to grant the prior order "reasoned deference," which it defined as "'a thoughtful and thorough analysis of the parties' arguments involving the same patent and the same claim'" but that the court would "'in the end . . . render its own independent claim construction.'" Id. at 1108-09 (quoting Innovation, L.P. v. Intel Corp., No. 2:04-CV-450, 2006 U.S. Dist. LEXIS 41453 at *13 (E.D. Tex. June 21, 2006)).

Supporting this conclusion, the Court of Appeals for the Federal Circuit, which reviews claim constructions without deference to those of a lower court, has stated that "given the importance of uniformity of treatment of a given patent, this court would be remiss to overlook another district court's construction of the same claim terms in the same patent as part of this separate appeal."  Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323, 1329 (Fed. Cir. 2008 ) (reh'g denied, reh'g, en banc, denied, May 29, 2008) (internal quotes and citations omitted).  Thus, this Court will consider the constructions of the five disputed terms and phrases made by the Northern District of California.  However, the duty of this Court to review and weigh the evidence submitted by the parties, and ultimately to come to its own decision regarding the disputed claim terms from the '964 Patent, is not relieved by the prior claim construction by the Northern District of California.  As such, this Court will make its own, independent construction of the disputed terms.

C.  Construction of Disputed Terms and Phrases

As noted above, APE and ECA seek construction of five disputed terms and phrases from

the '964 patent: (1) the "cylindrical gear portion"; (2) "connected to"; (3) "integral"; (4) the "eccentric weight portion"; and (5) the "insert-receiving area".  The Court will address each these terms and phrases in order below.

### 1.  "Cylindrical Gear Portion"

On May 6, 2009, Plaintiff APE appeared in a <u>Markman</u> hearing before United States District Judge Phyllis J. Hamilton of the Northern District of California.  At that hearing, APE, along with the Defendant in those proceedings, Bay Machinery Corp., stipulated to the following construction of the disputed phrase "cylindrical gear portion": "**the 'gear portion' of the counterweight is a substantially cylindrical portion and has a rear face, a front face, and a plurality of gear teeth around its perimeter.**"[4]  <u>See</u> <u>APE v. Bay</u>, 2009 WL 1684611, at *5.  On June 23, 2009, during the <u>Markman</u> hearing before this Court, Plaintiff APE and Defendant ECA also stipulated to that language for the purposes of these proceedings.  <u>See</u> Doc. No. 42 at 4-5. Upon examination of the '964 Patent, this Court finds this construction of "cylindrical gear portion" to be consistent with the language of the claims and the specification, and hereby recommends its adoption.

### 2.  "Connected to"

This phrase appears in asserted claims 1, 6, 11 and 16.  APE argues that the proper meaning of the phrase should be:

---

[4]Bay Machinery Corp. is not a party to the proceedings before this Court.  Furthermore, neither APE nor ECA argue that the proceedings in the Norther District of California have preclusive effect.

> . . . joined together, united, or linked.  In this instance, the eccentric
> weight portion is joined with the cylindrical gear portion at a point
> radially outward of the axis of the cylindrical gear portion.
> 'Connected to' can mean that the two portions are separate pieces
> joined together so long as that connection is at a position radially
> outward of the axis.

See Joint Disputed Claim Terms Chart (Doc. No. 37), at 7.  ECA proposes a definition of :

> joined together, united or linked, but specifically exclud[ing]
> bolting as the '964 [P]atent teaches that prior art having bolted
> counterweights are not sufficiently durable.  While the '964
> [P]atent does not disclose any other ways to effect the condition
> of being 'connected to,' one of ordinary skill in the art likely would
> have known of other methods to effect the condition of being
> 'connected to,' such as welding or brazing.

See ECA's Proposed Claim Construction, Doc. No. 41 at 2.[5]  The Northern District of California

has construed "connected to" to mean simply "joined together, united or linked."  Bay, 2009 WL

1684611, at *17.

As required under the rules of claim construction, this Court first looks to the language of

the claims themselves in order to discern the meaning of the phrase to a person having skill in the

art.  The phrase "connected to" appears first in claim 1, which recites, *inter alia*: "[a] vibratory

assembly for imparting a vibratory force to a pile, comprising . . . at least one driving means

---

[5]As the name of the document implies, ECA submitted proposed claim construction
language along with APE in the Joint Disputed Claim Terms Chart.  See Doc. No. 37.  However,
during oral argument before this Court on June 23, 2009, ECA argued proposed construction that
did not appear in the joint document.  ECA filed updated proposed claim construction language
(i.e., the document entitled "ECA's Proposed Claim Construction") on July 21, 2009.  As such,
this Report and Recommendation does not consider ECA's proposed claim construction
language from the joint document.

-14-

operatively connected to said counterweight and adapted to rotate said counterweight about its rotational axis." '964 Patent, col. 9, ll. 33-53. The term is used in substantially the same manner in claims 6 and 11: as a description of the manner in which a driving mechanism is joined to the counterweight.

Claim 16 deviates from the above trend, reciting ". . . [a] cylindrical gear portion having a plurality of gear teeth around its circumference, said cylindrical gear portion being made of a first metal; an eccentric weight portion connected to said cylindrical gear portion at a position radially outward of the axis of said cylindrical gear portion . . ." '964 Patent, col. 11, ll. 10-15. This usage of the phrase "connected to" is the first and only time the phrase appears to describe the joining of the eccentric weight portion of the counterweight with the cylindrical gear portion of the counterweight. Furthermore, unlike the prior uses of phrase, it is unmodified by the term "operatively." However, despite these differences, and without arguments to the contrary by the parties, this Court presumes that the phrase "connected to" has the same meaning in claim 16 as it does in the other claims in which it is used. Given that there is no explicit definition of the phrase in the claims, the Court next turns to the specification for guidance.

The specification uses the term "connecting" to describe the joining of the counterweight to the shaft for rotation. Specifically:

> [t]he eccentric weight portion **43** has two threaded bores **108** that communicate with and are transversely oriented relative to the center bore **106**. The threaded bores **108** are adapted to receive conventional threaded lock fasteners to lock the shaft **82** within the center bore **106**, thereby securely connecting the counterweight **40** to the shaft for rotation with the shaft.

'964 Patent, col. 5, ll. 43-50.  The specification also describes that "[a]t least one motor is

operatively coupled to the counterweight," '964 Patent, col. 2, ll. 39-40.  While this implies that

"coupled" is synonymous with "connected to," the definition of the phrase, as it would be

understood by someone having skill in the art, is still unclear.

At this point in the analysis, Judge Hamilton turned to the Oxford English Dictionary (2d

ed. 1989) in order to construe the phrase, reasoning that "neither the claim language nor the

specification expressly define or describe the phrase . . . [n]or does the specification indicate

explicitly or implicitly that the patentee intended to import a novel or specialized meaning."

Bay, 2009 WL 1684611, at *11.  While any use of extrinsic evidence is disfavored, it is still

acceptable under case law so long as the extrinsic evidence is not contradicted by any intrinsic

evidence.  See Phillips, 415 F.3d at 1318-19.  Judge Hamilton noted that the Oxford Dictionary

gives "connected" the ordinary meaning of "conjoined; fastened or linked together," and the term

"coupled," which is used in the specification in a manner that appears to be synonymous with

"connected to," has the ordinary meaning of "tied, joined, linked, or associated together in

pairs."[6]  Bay, 2009 WL 1684611, at *11.

Judge Hamilton determined that, in light of these definitions, the drawings of the

invention in the patent, and the description of the invention in the specification, the phrase

"connected to" indicated "joined together, united or linked."  Bay, 2009 WL 1684611, at *11-

*12.  As this definition is not contradicted by any intrinsic evidence, and both parties to the

---

[6]The Northern District of California's opinion in Bay did provide pinpoint cites for the words "connected" or "coupled.".  However, this Court notes that their definitions are exactly the same in another edition of the Oxford English Dictionary.  See The Compact Edition of the Oxford English Dictionary, 520, 581 (1987).

instant litigation have incorporated it as part of their proposed claim construction language, this

Court accepts it as part of its construction of the term "connected to."

However, this Court's construction of this disputed phrase is not yet complete.  ECA

argues that any definition of "connected to" must exclude bolting as a method for "connecting"

parts of the claimed device.  ECA reads this limitation from the specification, pointing to the

following wording in, column 1, lines 39-51, of the '964 Patent:

> The prior art includes a vibratory assembly with counterweights
> having a solid eccentric weight bolted to a portion of a cylindrical
> gear.  These bolted weights are not sufficiently durable, because
> the bolts have a very undesirable tendency to break under the large
> stress loads generated during rotation counterweights [*sic*].
> Another prior art vibratory assembly avoids this breaking problem
> by using a cast, one-piece, solid counterweight having an eccentric
> weight portion that is integral with a cylindrical gear portion.
> These solid, cast counterweights, however, do not have sufficient
> mass to generate large enough vibratory forces to efficiently drive
> [*sic*] or pull piles.

See also Doc. No. 37 at 7.  ECA argues that the identification of this problem with the prior art in

the specification of the '964 Patent acts as a clear disavowal of the use of bolting as a method of

connection for the claimed invention.   See ECA's Resp. to APE's Opening Claim Construction

Br. (Doc. No. 33), at 25-26.

APE responds that this statement, which comes early in the specification, merely acts as

an identification of problems that existed in the prior art, and not as a disavowal of a specific

method of connecting parts of the claimed invention.  By APE's reasoning, the right to exclude

under the '964 Patent extends to embodiments of the counterweight in which the gear and

eccentric weight portions are connected to each other by bolting.

How to treat a limitation of the prior art that is stated in the specification of a patent is not a trivial issue.  On one hand the rules of patent drafting encourage an inventor to state such problems in order to show the examiner, and the person having skill in the art, how the new invention is novel or useful.  See M.P.E.P § 608.01(c) (Rev. 7, July 2008) (stating that "[w]here applicable, the problems involved in the prior art or other information disclosed which are solved by the applicant's invention should be indicated").   In contrast, a disclaimer of prior art that leads a person having skill in the applicable art to believe that the inventor had limited the scope of his or her patent protection could lead to such a limitation being read into the language of the claims. See Phillips, 415 F.3d at 1315-16.

Fortunately, the Court of Appeals for the Federal Circuit has provided some guidance on this issue.  In Ventana Medical Systems, Inc. v. BioGenex Laboratories, Inc., Ventana owned patents relating to automated methods and apparati for staining slides.  See 473 F.3d 1173, 1176 (Fed. Cir. 2006).  BioGenex argued that statements made in the "BACKGROUND ART" section of Ventana's patent that described the limitations of a number of prior art staining devices limited the scope of Ventana's patent protection from including the methods used by the named prior art.  Id. at 1180 (emphasis in original).  The court of appeals, noting that, under its standard in Phillips, 415 F.3d at 1316, language used in the specification could act as a disavowal of claim scope by the inventor in certain cases, rejected this argument.  Ventana, 473 F.3d at 1180.  That court decided instead that, in cases where general statements are used to identify limitations in the prior art, such statements, without more, "will not be interpreted to disclaim every feature of every prior art device discussed in the "BACKGROUND ART" section of the patent."  Id. at

1181 (emphasis in the original).[7]

Applying this precedent to the issue before this Court, it can be seen from the specification of the '964 Patent that several incarnations of prior art, and their shortcomings, are mentioned in the "BACKGROUND OF THE INVENTION" section.  See '964 Patent, col. 1, ll. 39-68, col. 2, ll. 1-17.  This prior art includes inventions that are connected by bolting as well as by casting, which is the method of "connecting" used in the preferred embodiment of the '964 Patent.  The statements in this section are also general in nature.  As such, this Court will not apply ECA's proposed limitation excluding bolting as a method of connecting parts of the '964 Patent.

Thus, for the reasons stated above, it is respectfully recommended that the phrase "connected to" be construed to mean: "**joined together, united or linked.**"


3.  "<u>Integral</u>"

The term "integral" appears in asserted claims 1, 6 and 11.  It also appears in unasserted claims 19, 21 and 27.  APE proposes the construction: ". . . composed of portions, parts, or pieces that together constitute the whole.  The portions act together to function as the counterweight."  Doc. No. 37 at 5.  ECA responds that the term should instead be construed "formed or cast of one-piece."  Doc. No. 41 at 2.  The Northern District of California construed the term as "formed or cast of one-piece."  <u>Bay</u>, 2009 WL 1684611, at *9.

---

[7]Additionally, the Federal Circuit noted that the method used in Ventana's preferred embodiment had also been identified in its "BACKGROUND ART" section as having problems in its prior-art form.  <u>Ventana</u>, 473 F.3d at 1180 (emphasis in original).  This provided further indication to that court that BioGenex's argument was without merit.  <u>See</u> <u>id.</u>

In order to construe this term, this Court first turns to the language of the claims. "Integral" first appears in claim 1, which recites, *inter alia*, "[a] vibratory assembly for imparting a vibratory force to a pile, comprising . . . [a] counterweight having a cylindrical gear portion and an eccentric weight portion integral with said cylindrical gear portion . . ." '964 Patent, col. 9, ll. 33-42. The language of claim 1 is representative of the use of the word "integral" as a descriptor of the structural relationship between the cylindrical gear portion and the eccentric weight portion throughout the claims.

ECA points to claim 16, and claim 19, which depends from 16, as evidence supporting their definition of "integral." Claim 16 recites ". . . an eccentric weight portion connected to said cylindrical gear portion . . ." while claim 19 recites "[t]he counterweight assembly in claim **16** wherein said eccentric weight portion is integral with said cylindrical gear portion . . ." '964 Patent, col. 11, ll. 13-14, 31-33. Under the doctrine of claim differentiation, dependent claim 19 must limit claim 16, from which it depends, in some way. See e.g., Andersen, 474 F.3d at 1369-70. This argument also finds credence in the Patent Act. See 35 U.S.C. § 112 ¶ 4 (stating, *inter alia*, ". . . a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed . . ."). As such, ECA's argument that "integral" limits "connected to" is compelling. See supra Part II.C.2..

Judge Hamilton of the Northern District of California found the context created by unasserted claims 21, 23 and 27 to be helpful to that court's construction of the term "integral." See Bay, 2009 WL 1684611, at *7. These claims describe a method for producing the counterweight involving casting, which the Northern District of California determined was supportive of the Defendant's argument that "integral" was properly construed to mean "one

-20-

piece."  See id.; see also '964 Patent, col. 11, ll. 38-55, col. 12, ll. 1-7, 13-15, 27-54.  This Court

is not convinced that these claims, which recite one method of production for the counterweight,

necessarily limit the patentee's right to exclude to counterweights produced through only that

method.  As such, given that the term "integral" is not explicitly defined in the claims, this Court

must turn to the specification for guidance.

      "Integral" is mentioned in several places within the specification.  Like its use in the

claims, the term is used in the specification to describe the structural relationship between the

cylindrical gear portion of the counterweight and the eccentric weight portion of the

counterweight.  See e.g., '964 Patent, col. 5, ll. 27-33 (stating "[i]n the preferred embodiment . . .

the counterweight **40** has a large mass integral to and projecting from the bottom portion **104** of

the gear portion **41** . . ."); see also '964 Patent, col. 3, ll. 44-46 (stating "[e]ach counterweight **40**

has a gear portion **41** and an eccentric weight portion **43** that is integral to the gear portion).

      Judge Hamilton cites to several passages from the specification in the course of

construing the term as meaning "formed or cast of one-piece."  First, her opinion cites that

"'[t]he present invention ... provides a method of making a counterweight assembly adapted to

rotatably fit in a vibratory assembly.  The counterweight assembly having a cylindrical gear

portion and an integral eccentric weight portion is cast with a first metal such as steel.'"  Bay,

2009 WL 1684611 at *8 (quoting '964 Patent, col. 2, ll. 52-57).  The above quotation, however,

appears to be a summation of claims 21, 23 and 27, which provide a method for producing the

invention through casting, but does not conclusively limit the right to exclude to embodiments of

the invention that are produced in such a manner.  As such, this passage of the specification

provides little useful guidance.

Judge Hamilton's opinion next references the following passages in the specification: "[t]he eccentric weight portion **43** of the counterweight **40** . . . is formed integral with the gear portion **41** . . . " '964 Patent, col. 5, ll. 20-22, and:

> [i]n the preferred embodiment, the counterweight **40** is a one-piece component that is cast with a predetermined metal, such as steel . . . [t]he bottom portion **104** of the counterweight **40** is cast having insert receiving areas or bores **112** substantially parallel to the center bore **106** and extending fully through the gear portion **41** and fully through the eccentric weight portion **43**.

'964 Patent, col. 5, ll. 51-53, 61-65.[8]  Both of these passages refer to the preferred embodiment of the invention.[9]  As such, this court does not believe that these passages would necessarily lead a person having ordinary skill in the art to believe that any embodiments of the counterweight would need to be cast of one piece in order to fall within the scope of the patent

Finally, Judge Hamilton's claim construction opinion points to the fact that the specification references cast, one-piece counterweights having integral eccentric weight portions in the prior art as evidence that the inventor contemplated only that embodiment of the invention. See Bay, 2009 WL 1684611, at *8 (citing '964 Patent, col. 1, ll. 45-48).  However, a reading of the full paragraph surrounding that section of the specification reveals that the inventor cited to

---

[8]The phrase "**41** and fully through the eccentric weight portion **43**," '964 Patent, col. 5, ll. 64-65, was not in Judge Hamilton's claims construction opinion, and was included by this Court in order to preserve the complete language of the cited passage of the specification.  See Bay, 2009 WL 1684611, at *8.

[9]Indeed, just a few lines before the passage  "[t]he eccentric weight portion **43** of the counterweight **40** . . . is formed integral with the gear portion **41** . . . " from '964 Patent, col. 5, ll. 20-22, the language of the specification refers the reader to Figures 3A and 3B.  See '964 Patent, col. 5, l. 17.  Prior to this passage in the specification, those Figures are clearly identified as relating to the preferred embodiment of the invention.  See '964 Patent, col. 3, ll. 9-23.

-22-

prior art that involved bolting as well, implying that the inventor contemplated bolted embodiments of his invention.  See '964 Patent, col. 1, ll. 39-48. Furthermore, the fact that the inventor mentioned all of the descriptive terms "cast," "one-piece," and "integral," in the same passage in order to describe the prior art could very well mean that a person having skill in the art would not view those terms to be synonymous.  Given the ambiguity of the specification, this Court, seeking more evidence, turns to the prosecution history.

In 2006, the PTO reexamined the validity of the claims of the '964 Patent.  In an attempt not to have the claims invalidated, the patent owner argued that claims 1, 6, and 11 were distinguished from prior art (specifically U.S. Patent No. 3,224,514, issued to Hornstein) because they recited an invention in which "the counterweight has a cylindrical gear portion and an eccentric weight portion and that these two components are integral - i.e., they are simply components of the one-piece counterweight."  See APE's Claim Construction Reply Br., Ex. A (Doc. No 35-2), at 7.  Seemingly, this would serve as a clear limitation of the scope of the term "integral" by the patent owner in the prosecution history.  However, in the PTO's following office action, this proposed limitation of "integral" was explicitly rejected by the examiner.  Finding no explicit definition in the specification of "integral" meaning one piece, the examiner gave the term its broadest possible meaning, concluding "[t]hus, whether 'integral' is defined as 'one-piece' or several parts rigidly secured together as a single unit, it does not read on the structure of [the Hornstein Patent]."  See APE's Opening Claim Construction Br., Ex. C (Doc. No. 30-4), at 14.  There is no evidence in the record of the patent owner contesting this interpretation of the term "integral" at any subsequent point in time.

As stated above, the Federal Circuit has held that, in order for a statement made by a

patent owner in the prosecution history to limit the scope of his or her patent protection, that statement must be a "clear and unmistakable disavowal" of a broader scope of protection.  See Purdue Pharma, 438 F.3d at 1136.  It is well established that the prosecution history is evidence of the process of negotiations between an inventor and the PTO and, as such, it can be less clear than the specification in determining the proper construction of disputed terms and phrases.  See Phillips, 415 F.3d at 1317.

In reading the prosecution history of the patent-in-suit, as a whole, this Court has determined that the statement made by the patent owner implying that "integral" means "one-piece" does not constitute a clear and unmistakable disavowal of a broader definition for two reasons. First the patent examiner explicitly rejected the narrow "one-piece" definition.  Second the patent owner never contested that rejection.

Having reviewed the above intrinsic evidence, this Court is convinced that any construction of the term "integral" must include embodiments of the mentioned counterweight that are formed or cast of one piece.  It is also clear that "integral" must, in some way, limit the previously-construed phrase of "connected to."  See supra Part II.C.2.  However, this Court remains unconvinced the persons having ordinary skill in the applicable art would necessarily believe that the '964 Patent's scope would cover solely embodiments of the counterweight that are formed or cast of one piece.  As such, this Court will not limit the construction of this disputed term in such a manner, which, based on the available evidence, would be an improper reading of limitations from the specifications upon the language of the claims.  See Sjoland, 847 F.2d at 1581-82.  Given the language of the claims and the specification, and paying specific attention to the nature of the cylindrical gear portion and the eccentric weight portion as parts of

the whole counterweight, this Court recommends that the term "integral" be construed in the following manner: **forming a complete structural whole**."

4.  "Eccentric Weight Portion"

The phrase "eccentric weight portion" is found in asserted claims 1, 3, 6, 11 and 16, as well as in unasserted claims 19, 21, 26 and 27.  APE argues that the phrase "eccentric weight portion" should be defined functionally as ". . . that portion of the counterweight that contributes to the eccentric moment of the counterweight.  The portion is part of the whole counterweight, but need not be a separate component piece or part."[10]  Doc. No. 37 at 4.  ECA, however seeks a structural definition of the phrase, positing that it should be construed as "[t]he mass that extends forward from the front face or rearward of the rear face of the gear portion of the counterweight and causes an unequal weight distribution about the rotational axis."  Doc. No. 41 at 1.  After examining the papers and arguments in the Bay case, Judge Hamilton of the Northern District of California construed the phrase to mean "the bottom portion of the counterweight, which extends forward from the front face of the gear portion, containing more weight than the top portion due to its larger mass, including at least one insert-receiving area therein adapted to receive at least one solid tungsten rod."  Bay, 2009 WL 1684611, at *6.

In order to construe this phrase, this Ccourt turns first to the language of the claims themselves.  Claim 1 recites, *inter alia*: "[a] vibratory assembly for imparting a vibratory force to

---

[10]APE defines "eccentric moment" as being weight multiplied by the distance from the axis of rotation from the center of gravity.  See Doc. No. 30 at 4, n.1.  This term is not defined in the language of the claims or  specification of the '964 Patent, but instead appears to be a term of art from the physical sciences.  APE's definition of eccentric moment is not contested by ECA.

-25-

a pile, comprising . . . [a] counterweight having a cylindrical gear portion and an eccentric weight

portion integral with said cylindrical gear portion, said eccentric weight portion having at least

one insert-receiving area formed therein, said counterweight being made of a first metal."  '964

Patent, col. 9, ll. 33-44.  Throughout the claims, certain structural attributes are assigned to the

eccentric weight portion: (1) it is part of the counterweight; (2) it is integral with the cylindrical

gear portion;[11] (3) it is made of a first metal; and (4) it is designed to hold at least one insert-

receiving area.  The Court is satisfied that the meaning of "eccentric weight portion" is consistent

throughout the claims.  However, as there is no explicit definition of the term in the claims, this

Court must turn to the specification for guidance.

The specification states that vibratory pile driving / pile extracting apparati are able:

> to generate extremely high driving and pulling forces by rapidly
> rotating large counterweights within vibratory [*sic*] assembly.  The
> counterweights are large cylindrical, eccentrically weighted gears,
> i.e., they have an uneven weight distribution around the body of the
> gear such that its center of gravity is radially outward from the
> gear's rotational axis.

'964 Patent, col. 1, ll. 23-29.  The specification further provides:

> The vibratory assembly **34** generates substantially vertical
> vibratory forces by rotating at high speeds two counterweights **40** .
> . . Each counterweight **40** has a gear portion **41** and an eccentric
> weight portion **43** that is integral to the gear portion.  The eccentric
> weight portion **43** has dense, solid, metal inserts **45** mounted
> therein to increase the mass of the eccentric weight portion, and to
> position the center of gravity of the counterweight **40** radially

---

[11]The Court takes notice that in claim 16, the eccentric weight portion is described as only
being "connected to" the cylindrical gear portion, which implies a less complete form of joining
than integral.  See '964 Patent, col. 11, l. 13.

outward from its rotational axis.

'964 Patent, col. 3, ll. 42-51.  The two above sections of the specification demonstrate that the

unbalanced, or eccentric, nature of the counterweight is a necessary part of this invention.

Furthermore, these passages provide notice to the person having skill in the art that the "eccentric

weight portion" is the part of the counterweight that, at least partially, provides that unbalanced,

eccentric weight.

Central to ECA's argument that the eccentric weight portion is limited to structure

extending from the gear face is the following passage from the specification:

> As best seen in FIGS. 3A and 3B, the gear portion **41** of the
> counterweight **40** is substantially cylindrical and has a rear face **94**,
> a front face **96**, and a plurality of gear teeth **98** around its
> perimeter. The eccentric weight portion **43** of the counterweight
> **40**, which is formed integral with the gear portion **41**, extends
> forward from the front face **96** of the gear portion. The gear portion
> **41** has a weight distribution with less weight provided by a top
> portion **102** and more weight provided by a bottom portion **104** as
> a result of the eccentric weight portion **43** being connected thereto.
> In the preferred embodiment, the eccentric weight portion **43** has a
> substantially semi-cylindrical portion **100**, and the bottom portion
> **104** constitutes over one-half of the area of gear portion.
> Accordingly, the counterweight **40** has a large mass of material
> integral to and projecting from the bottom portion **104** of the gear
> portion **41**, thereby forming a counterweight having a center of
> gravity located radially outward from the rotational axis of the gear
> portion.

'964 Patent, col. 5, ll. 17-36.  However, as was noted above, Figures 3A and 3B are explicitly

stated in the specification to show only the preferred embodiment of the counterweight.  See '964

Patent, col. 3, ll. 9-24.  Given that the above passage, by reference, refers only to the preferred

embodiment of the invention, this Court must determine whether a person having skill in the art would read the limited physical structure of the preferred embodiment onto the language of the claims.  This Court believes that such a person would not do so.

The physical structure of the preferred embodiment of the invention in the '964 Patent, as exemplified in the specification, is not necessary for the invention, in general, to carry out its task in the manner described in the claims and the specification.  For example, this Court can imagine a hypothetical construction of the claimed counterweight, in which the structure of the eccentric weight portion does not extend from a gear face, but is instead completely enclosed within the cylindrical gear portion.  There is no evidence before this Court that such a hypothetical embodiment would necessarily behave in a substantially different way from the preferred embodiment described in the specification, or that it would read on prior art.  As such, ECA's argument that a person having skill in the art would limit the eccentric weight portion to some physical structure that is attached to the gear face in the preferred embodiment is unpersuasive.

However, it is important to note that there is one significant limitation to the structure of the eccentric weight portion: it cannot be defined to include the solid, heavy metal member that is housed in the insert area.  This limitation comes from the prosecution history.  During the 2006 reexamination, the patent owner, in an attempt to differentiate the '964 Patent from the Hornstein Patent, argued that the two inventions differed because the counterweight recited in the '964 Patent had eccentric weight independently of its inserts, and Hornstein's invention did not.  See Doc. No 35-2 at 5.  Since this argument was persistently made and eventually accepted by the examiner, this constitutes a clear and unambiguous disavowal of broader protection.  See J.A. of Intrinsic Evidence, Ex. D (Doc. No. 38-5), at 10; see also APE's Compl., Ex. A (Doc. No. 1-3),

at 14-15.

After weighing the above evidence, this court recommends that "eccentric weight portion" be construed as meaning: "**the portion of the counterweight, being made of a first metal, that provides unbalanced weight to the counterweight with respect to the counterweight's axis of rotation, and with at least one insert-receiving area**."


     5.  "<u>Insert-Receiving Area</u>"

This phrase appears in asserted claims 1, 3, 6, 11 and 16, as well as in unasserted claims 4, 15, 21, 22, 24 and 27.[12]  APE argues that the proper construction of this phrase is ". . . a region of the eccentric weight portion that is capable of receiving an insert, as opposed to receiving material being poured into the region."  Doc. No. 37 at 6.  ECA counters that "insert-receiving area" should be construed as "a bore extending into the eccentric weight portion and shaped to receive a solid insert."  Doc. No. 41 at 2.  The Northern District of California construed the phrase to mean "a bore formed in the eccentric weight portion of the counterweight, which extends fully through the gear portion and fully through the eccentric weight portion of the counterweight, capable of receiving a solid tungsten rod." <u>Bay</u>, 2009 WL 1684611, at *10.  In order to construe the phrase properly, this Court first turns to the language of the claims themselves.

The "insert-receiving area" is first mentioned in claim 1, which recites, *inter alia*, "[a] vibratory assembly for imparting a vibratory force to a pile, comprising . . . [a] counterweight

_____

    [12]The phrase appears in only its plural form, i.e. "insert-receiving areas" in claims 4 and 15.

having a cylindrical gear portion and an eccentric weight portion integral with said cylindrical gear portion, said eccentric weight portion having at least one insert-receiving area formed therein. . ." '964 Patent, col. 9, ll. 33-43.  Claim 3 describes the insert-receiving area as "a bore in said eccentric weight portion. . ." '964 Patent, col. 9, ll. 57-58.  Furthermore, from claim 4, it may be seen that the "insert-receiving area" is designed to have a solid insert member (e.g., tungsten rod) solidly adhered within it by means of an adhesive.  See '964 Patent, col. 9, ll. 60-62.

A reading of all the claims shows that the phrase "insert-receiving area" is used consistently throughout the claims of the patent, and that its definition is meant to be the same in all of the claims.  Furthermore, it is notable that whenever the location of the insert-receiving area is mentioned in the claims, it is consistently described as being formed in the eccentric weight portion.  The claims also repeatedly describe the insert-receiving area in connection with securely holding a solid insert member.  However, there is no part of the claims that gives an explicit definition of the insert-receiving area, so this Court, in accordance with case law, turns to the specification of the '964 Patent for guidance.

The specification states:

> The bottom portion **104** of the counterweight **40** is cast having insert receiving areas or bores **112** substantially parallel to the center bore **106** and extending fully through the gear portion **41** and fully through the eccentric weight portion **43**. In the preferred embodiment, two insert receiving bores **112** are formed in the counterweight **40**, although the number of bores can be varied. The insert receiving bores are shaped **112** to receive the solid insert **45**, wherein the solid insert is manufactured from a metal that has a density or specific gravity that is greater than the density or specific gravity of the metal used to form the remainder of the

> counterweight **40**. The preferred solid insert **45** is a tungsten rod
> machined to close tolerances such that the solid insert fits snugly
> within the insert receiving bore **112**.

'964 Patent, col. 5, ll. 61-68, col. 6, ll. 1-7.[13]  In light of the language of the specification, and

given this Court's above construction of "eccentric weight portion" as being able to share

structure with the "cylindrical gear portion," this Court recommends that the phrase "insert-

receiving area" be construed to mean: "**a bore, formed in the eccentric weight portion of the**

**counterweight, which is designed to receive and securely hold one solid insert member**

**made of a second metal having a specific gravity higher than that of the first metal and a**

**melting point temperature of 328° C or greater.**"


III.  **CONCLUSION**

It is respectfully recommended that the following constructions for the five disputed

terms and phrases at issue in these proceedings be adopted:

1.      "Cylindrical gear portion" is construed to mean "**the 'gear portion' of the**

**counterweight is a substantially cylindrical portion and has a rear face, a front face,**

**and a plurality of gear teeth around its perimeter;**"

2.       "Connected to**"** is construed to mean "**joined together, united or linked;**"

---

[13]Like this Court, Judge Hamilton of the Northern District of California also found this
passage, up to column 6, line 5, to be instructive in making her construction of this term.  See
Bay, 2009 WL 1684611, at *9.  Curiously, however, the quotation of this paragraph of the
specification, as transcribed into that opinion, lacks the phrase "and fully through the eccentric
weight portion **43**" from column 5, lines 64-65 of the '964 Patent.  Bay, 2009 WL 1684611, at
*9.

3.      "Integral"is construed to mean **"forming a complete structural whole;"**

4.      "Eccentric weight portion" is construed to mean **"the portion of the counterweight, being made of a first metal, that provides unbalanced weight to the counterweight with respect to the counterweight's axis of rotation, and with at least one insert-receiving area;"** and

5.      "Insert-receiving area" is construed to mean **"a bore, formed in the eccentric weight portion of the counterweight, which is designed to receive and securely hold one solid insert member made of a second metal having a specific gravity higher than that of the first metal and a melting point temperature of 328° C or greater.**"

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates Judges, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.  Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.


Dated:  August 3, 2009               By the Court:

                                   /s/ Lisa Pupo Lenihan
                                   LISA PUPO LENIHAN
                                   United States Magistrate Judge


cc:      The Honorable David Stewart Cercone
          United States District Judge

          All Counsel of Record
          *Via Electronic Mail*